```
         IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF ARKANSAS
                  FAYETTEVILLE DIVISION
```

**NORMAN JAY CARPENTER**                                              **PLAINTIFF**

    **v.**                      **Civil No. 09-5276**

**BENTON COUNTY, ARKANSAS;**
**DEPUTY HAROLD GAGE, DEPUTY**
**KENNETH D. PAUL; and SHERIFF**
**KEITH FERGUSON,**
**in their official and individual capacities**        **DEFENDANTS**

## O R D E R

    NOW on this 19th day of April, 2011, comes on for consideration defendants' **Motion for Summary Judgment** (Doc. 19) and plaintiff's response thereto. The Court, being well and sufficiently advised, finds and orders as follows:

    1. This case arises out of an incident that occurred on April 4, 2008, at the residence of the plaintiff, Norman Jay Carpenter. On that day, plaintiff's girlfriend called 911 because she believed that plaintiff was having a stroke. When the first responders arrived, plaintiff acted aggressively towards them. The first responders called the police and, after police arrived on the scene, a confrontation occurred. Plaintiff was arrested and transported to the Benton County jail where he was charged with assaulting a deputy. That criminal charge was eventually dismissed. Three or four days after he was released from jail, plaintiff sought medical treatment. Plaintiff claims that he suffered permanent injuries as a result of not receiving timely emergency medical care.

2.    Plaintiff filed his lawsuit on December 8, 2009, and, with the Court's permission, filed a First Amended Complaint on July 27, 2010.  The current claims brought by plaintiff against the defendants are:

Count #1  - unlawful entry of residence without lawful authority;

Count #2  - use of excessive force;

Count #3  - unlawful detention;

Count #4  - denial of emergency medical care; and

Count #5  - failure to train law enforcement officers.

Plaintiff has sued defendants in their individual and official capacities.   Plaintiff  seeks  compensatory  damages,  punitive damages, costs and his attorney's fees.

3.    Summary judgment shall be granted when the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

4.    The following material facts are undisputed:

*    On or about April 4, 2008, Connie Gunem, who had been dating plaintiff, went to plaintiff's house.

*    After the two awoke from a nap, Gunem noted some odd behavior from plaintiff.  Specifically, plaintiff was slurring his speech, was falling over, his face was really drawn, and there was saliva dripping from his mouth and he "looked horrible."  (Gunem depo. at 11).

\*     Gunem started to call 911, but plaintiff started arguing with her.  So, she went outside and called 911.

\*     When the first responders[1] arrived and entered his house, plaintiff started "yelling" and telling them to "get the hell out of there."  (Gunem depo. at 12-14).  Plaintiff recalls telling the first responders that "there wasn't nothing wrong with me" and asking them to leave.  (Plaintiff's depo. at 17).  When the first responders did not leave, Plaintiff recalls saying, "I got a baseball bat that says you will get out of here."  (*Id.* at 19).  The first responders exited the house, and called the police.

\*     When the police arrived, Gunem told them that there was a rifle in the house.  (Gunem depo. at 16).   Plaintiff admits that he had a ".22 and a BB gun" in the house."  (Plaintiff's depo. at 28).

\*     When Deputy Gage arrived on the scene, he talked to Gunem who told him that she thought plaintiff "had a stroke, so she called the paramedics, and she told [Gage] a little bit about him slurring and slobbering and some other stuff."  (Gage depo. at 9).  Deputy Gage then spoke to the first responders who told him that

---

[1] The first people to arrive were the "first responders" who are the people who respond to 911 calls before the ambulance arrives.  (Gates depo. at 8).  In several of the depositions provided to the Court, witnesses refer to the ambulance and the "paramedics" on the scene.  It is not clear to the Court, however, whether an ambulance actually arrived.  For ease of reference, the Court will refer to the medical personnel who were present as the first responders – although there may have been other medical personnel, such as paramedics, present as well.

plaintiff had "ran them out of there with a baseball bat." (Gage depo. at 9).

\*   Deputy Gage went up to plaintiff's house and knocked on the door. About the same time, Deputy Paul walked up to the house. Deputy Paul had been informed that "there was a possibility a rifle [was] in the house, that was what was reported, and also a baseball bat." (Paul depo. at 9). At this point, plaintiff opened his door and said, "who the hell's on my front porch?" (Gage depo. at 12). Deputy Gage identified himself and said "I need to see if your alright and I need to talk to you about your little incident with the bat." (*Id.*).

\*   At that point, Deputy Paul asked plaintiff what the problem was, and plaintiff said "that's the f'ing problem right there, and he's pointing to Deputy Paul's badge." (Gage depo. at 13; Paul depo. at 9). Deputy Gage told plaintiff, "they're telling us you had a stroke, are you ok?" (Gage depo. at 13). Plaintiff said something the deputy could not understand, and then he turned to walk back into his house. "By him acting like that, [Deputy Gage] followed him because [he] didn't want [plaintiff] retrieving a gun." (*Id.*). Deputy Gage admits that, at this point, plaintiff had not threatened him or any other officer. (*Id.* at 14). Deputy Paul immediately followed behind Deputy Gage into the house. (Paul depo. at 10).

\*   After they entered the house, Deputy Gage kept trying to ask plaintiff if he was ok, but plaintiff was not acknowledging

him.  "So, when [plaintiff] started to go to the bedroom, [Gage] grabbed his coat sleeve."  (Gage depo. at 15).  Plaintiff "got belligerent.  So [Deputy Gage] told [plaintiff] I was going to shoot him."  (*Id.*; Paul depo. at 13).

    \*   "At that point, [plaintiff] tried to go . . . towards the bedroom, and [Deputy Gage] grabbed a hold of his sleeve.  [Plaintiff] said, you son of a - and he reared back and he swung and what [Deputy Gage] did is just pushed [plaintiff's] arm in from of him and he ended up hitting himself.  By that time, when he hit his own shoulder, he was on the ground, and [Deputy Gage] still had a hold of [plaintiff's] arm."  (Gage depo. at 21).

    \*   There were 5 police officers in the house at the time.  They all tried to subdue plaintiff.  Deputy Paul and/or one of the other officers screamed several times to plaintiff "give us your hands . . stop resisting."  (Paul depo. at 14).  At that point, Deputy Paul told plaintiff "if you do not give us your hands, I will drive stun[2] you in the back."  (*Id.*).  When plaintiff did not comply, Deputy Paul used his tazer gun and tazed plaintiff twice.  (*Id.* at 14-16; Gage Depo. at 21).

    \*   Plaintiff's memory of the incident in his house is sketchy.  Plaintiff recalls an officer telling him to stand still, or that he gave him "some kind of order."  (Plaintiff's depo. at

---

[2] A "drive stun" – according to Deputy Gage – means to take the cartridge off the tazer and touch it directly to the body.  (Gage depo. at 19-20).  Deputy Gage admitted that a drive stun causes pain, but he said the purpose is to temporarily immobilize the suspect.  (*Id.*).

25). Plaintiff asserts that the officer said "if you don't do so-and-so, I'm going to shoot you." (Plaintiff's depo. at 25). Plaintiff asserts that he responded by saying, "well, blow my f'ing head off if that's what makes you sleep good." (*Id.*). At that point, the officer informed plaintiff that he did not have a gun, he had a tazer. (*Id.*).

* Plaintiff says the next thing he knew was that he was "thrown face-down on the floor" and he could not breathe. (Plaintiff' depo. at 27). He says that he put his arm up on the couch "trying to breathe" and the officers told him to get his arm down, and when he wouldn't "that's when they just kept tazing me in the back." (*Id.* at 27, 35). Plaintiff says that he "kept telling [the officers] I couldn't breathe and they didn't care." (*Id.* at 35). He says that his other arm was underneath him, so he couldn't put it behind his back as the officers commanded him to do. (*Id.* at 52).

* Plaintiff denies ever swinging at the police officers or that he raised his hand in any way to them. (*Id.* at 36).

* After Deputy Paul tazed plaintiff, he handcuffed him, sat him up on the couch, and called the first responders in to look at him. Deputy Paul asserts that they asked plaintiff if he wanted to be transported to the hospital, and plaintiff refused. (Paul depo. at 17). Plaintiff denies that he refused to go to the hospital, but he admits that the first responders did not tell him that there was any problem and that he did not ask any questions.

(Plaintiff's depo. at 37). Further, plaintiff has not asserted that he expressly asked to go to the hospital.

* Deputy Paul then transported plaintiff to jail. (Paul Depo. at 18).

* Plaintiff cannot identify the officers who were in his house and tazed him because he was "attacked from behind." (Plaintiff's depo. at 41-43).

* With respect to defendant Deputy Paul, plaintiff does not remember seeing him until Paul was putting plaintiff in the police car after he was arrested. (*Id.* at 29).

* With respect to defendant Duty Gage, plaintiff does not remember seeing Gage on his property at all. (*Id.* at 29-30).

* Plaintiff was charged with assaulting Deputy Gage. That criminal charge was subsequently dismissed.

* Plaintiff was released from jail later that night. (Plaintiff's depo. at 38-39, 45-46). He went to the hospital three or four days later, and learned that he had suffered two strokes. (*Id.*). Plaintiff asserts that he has permanent injuries as a result of not receiving timely emergency medical treatment.

5. At the outset, the Court will address plaintiff's claim for denial of medical care.

(a) To establish a constitutional violation for denial of a medical need, plaintiff must show that he suffered from a serious medical need, and that the defendants acted with "deliberate indifference," such that they actually knew of his need, but

deliberately failed to meet it. *Hott v. Hennepin County,* 260 F.3d 901, 906 (8th Cir. 2001); *Williams v. Kelso*, 201 F.3d 1060, 1065 (8th Cir. 2000).

(b)  A "serious medical need" is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *See Johnson v. Busby*, 953 F.2d 349 (8th Cir. 1991).

(c)  To establish deliberate indifference, a plaintiff must demonstrate that "he suffered objectively serious medical needs, and the officials actually knew of but deliberately disregarded those needs." *Webb v. Hedrick*, 2010 U.S. App. LEXIS 23261, at *2 (8th Cir. Nov. 5, 2010) (*quoting Johnson v. Hamilton*, 452 F.3d 967, 972-72 (8th Cir. 2006)). "[N]egligence alone is not actionable under the Eighth Amendment." *Id.* at *3 (*citing Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L.Ed. 2d 251 (1976)).

(d)  In the Court's view, plaintiff has failed to show that he suffered a "serious medical need" as defined above because, while he argues that it was obvious that he needed emergency medical treatment, no physician had mandated that he receive treatment and there is no evidence that the first responders said that plaintiff needed to go to the hospital. Thus, it cannot reasonably be said that the deputies should have recognized plaintiff needed to go to the hospital when the medical personnel at the scene did not recognize any such need.

(e)   Even if -- in light of plaintiff's subsequent diagnosis at a hospital -- it could be said that plaintiff had a serious medical need at the time of his arrest, he has not shown that either Deputy Gage or Deputy Paul actually knew of, but deliberately disregarded, that need.

Indeed, Deputy Paul testified that, while plaintiff was acting strangely before he was arrested, he calmed down after they handcuffed him and they immediately called in the first responders to check him out.  There is no evidence in the record that the first responders advised the officers that plaintiff needed medical care.  Deputy Paul further testified that, when they asked plaintiff if he wanted to go to the hospital, he refused.  While plaintiff denies that he refused to go to hospital, he does not assert that he asked to go to the hospital.  Further, his memory of the events are sketchy.

(f)   Plaintiff submits the deposition testimony of two doctors for the purpose of showing that persons having a stroke need to be treated immediately at a hospital, and that a person having a stroke may be unaware that they need medical care.  Based on this testimony, plaintiff argues that it was unreasonable for the deputies to rely on plaintiff's refusal to seek treatment and, moreover, if they did not recognize that he had a serious medical need, then they had not been properly trained by the Benton County Sheriff's Department.

Plaintiff's argument misses the point. The issue is whether defendants acted with deliberate indifference to a medical need of which they were actually aware. While a physician may have recognized plaintiff's medical need to go to the hospital, there is no evidence in the record from which a reasonable person could find that either Deputy Gage or Deputy Paul actually recognized that plaintiff needed emergency medical care, and deliberately refused to meet that need.

Therefore, defendants are entitled to summary judgment on plaintiff's denial of medical care claim.

6. The Court now turns to plaintiff's remaining constitutional claims. Defendants Deputy Gage and Deputy Paul assert that they are entitled to qualified immunity for their actions and, therefore, are entitled to summary judgment on plaintiff's claims against them in their individual capacities.

(a) "The doctrine of qualified immunity protects government officials such as police officers from individual liability under § 1983, unless their conduct violated 'clearly established' . . . constitutional rights of which a reasonable person would have known." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 473-74 (8th Cir. 2010) (internal citation omitted).

(b) To overcome the defendants' qualified immunity claims, plaintiff must show that:

      (1)   the facts, when viewed in the light most favorable to the plaintiff, demonstrate that defendants deprived plaintiff of a constitutional right; and

      (2)   the right was clearly established at the time of the deprivation.

*Baribeau,* 596 F.3d at 474.

(c) Plaintiff alleges that Deputies Gage and Paul deprived him of his constitutional rights by:

* entering his home without justification:
* arresting him without probable cause; and
* using excessive force in arresting him.

The Court will address each of these claims in turn:

**(d)** **Warrantless entry of plaintiff's home**

"Police officers may not enter or search a home without a warrant unless justified by exigent circumstances." *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). "The exigent circumstances exception to the warrant requirement is narrowly drawn." *Id.* "The exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *Id.*

Plaintiff asserts that the police officers did not have consent to enter his house, and that no exigent circumstances existed. The Court does not need to reach the issue of consent, because the Court finds that exigent circumstances existed.

Specifically, at the time they entered plaintiff's house, the deputies believed that plaintiff had threatened the first responders with a baseball bat, and that he had a gun in the house. Further, when the deputies approached plaintiff, he was belligerent and uncooperative. When plaintiff entered his house, it was reasonable for the officers to follow, acting on their belief that plaintiff posed a threat to them and to others outside if he went inside to get his gun.

**(e)  Lack of probable cause to arrest**

"The Fourth Amendment, as applied to the States through the Fourteenth Amendment, requires that an officer have probable cause before making a warrantless arrest." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010). "Probable cause exists when a police officer has reasonably trustworthy information that is sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime." *Id.*

Plaintiff asserts that there was no probable cause to arrest him for assault because he never took a swing at Deputy Gage. Plaintiff asserts that Officer Jim Johnson -- who was also at the scene -- supports his version of events.

The Court has reviewed Officer Johnson's deposition and, specifically, the portion cited by plaintiff. Officer Johnson testified that plaintiff "threw his arms in the air in a very agitated state and then started walking into the kitchen area." (Johnson depo. at 10). While Officer Johnson did not state that

plaintiff took a swing at the officers, he was never directly asked that question – as far as the Court can tell.

Thus, while the Court must view the evidence in the light most favorable to plaintiff and should not weigh evidence or make credibility determinations, the only reasonable conclusion -- based on the evidence before the Court -- is that plaintiff took a swing at Deputy Gage.  There is no basis on which to question the credibility of Deputy Gage's or Deputy Paul's testimony -- both of whom assert that plaintiff took a swing at Deputy Gage.  While plaintiff denies that he did so, his memory of the events from that day are incomplete, to say the least.  Thus, the Court finds that the dispute over whether plaintiff took a swing at Deputy Gage is not "genuine" and, thus, does not preclude summary judgment.

Further, the defendants also assert that they had probable cause to arrest plaintiff for threatening the first responders with a baseball bat.  "Probable-cause determinations generally may be based on hearsay." *United States v. Leppert*, 408 F.3d 1039, 1042 (8th Cir. 2005).  The Court finds that the evidence is undisputed that the officers believed, at the time, that plaintiff had physically threatened the first responders with a bat, which also gave the deputies probable cause to arrest plaintiff.

### (f) **Excessive Force Claim**

Plaintiff relies on *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) in support of his claim that Deputies Gage and Paul used excessive force on him.

In that case, the Eighth Circuit stated that courts should analyze excessive force claims in the context of seizures under the Fourth Amendment. *Brown*, 574 F.2d at 496. The Supreme Court's "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Id.* (*quoting Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Id.* (internal quotation marks and citations omitted). The Court evaluates the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (internal quotation marks and citations omitted). "This calculus allows for the fact that police officers are often forced to make split-second decisions--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.* (internal quotation marks and citations omitted).

The circumstances that are relevant to the reasonableness of the officer's conduct include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

attempting to evade arrest by flight." *Brown*, 574 F.3d at 496 (internal quotation marks and citations omitted).

The Court finds that, from the perspective of a reasonable officer on the scene, Deputy Paul's use of the tazer gun was objectively reasonable. The officers acted reasonably in their assessment that plaintiff posed an immediate threat to the safety of the officers or others because he had a gun in the house and he was actively resisting arrest and/or attempting to evade arrest by walking away from the officers.

While plaintiff's medical condition may have been the reason for his behavior, the officers -- when faced with the possibility that plaintiff was going to his bedroom to retrieve a gun -- used force that was objectively reasonable under the particular circumstances to subdue him.

Thus, the Court finds that the facts, when viewed in the light most favorable to the plaintiff, demonstrate that neither Deputy Gage nor Deputy Paul deprived plaintiff of his Eighth Amendment right to be free from excessive force.

(g) Therefore, because neither Deputy Gage nor Deputy Paul deprived plaintiff of a constitutional right, they are entitled to qualified immunity for their actions, and plaintiff's claims against them in their individual capacities will be dismissed. Further, because plaintiff has not established any constitutional violation, his claims against Deputy Gage and Deputy Paul in their official capacities will also be dismissed.

7. The Court now turns to plaintiff's failure to train claim. A governmental or municipal entity may be held liable under § 1983 if it fails to train or supervise the subordinate who caused the violation. *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994).

In the case at bar, because plaintiff's allegations fail to state a claim for an underlying constitutional violation by either Deputy Gage or Deputy Paul, neither Benton County nor Sheriff Ferguson can be held liable for failure to train. *See Abbott v. City of Crocker*, 30 F.3d 994, 998 (8th Cir. 1994) ("The City cannot be liable ... whether on a failure to train theory or a municipal custom or policy theory, unless [an officer] is found liable on the underlying substantive claim.").

**IT IS THEREFORE ORDERED** that, for the reasons set forth above, defendants' **Motion for Summary Judgment** (Doc. 19) is hereby **GRANTED** and plaintiff's First Amended Complaint is hereby **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

/s/ Jimm Larry Hendren
HON. JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE